[Cite as *State v. Guice*, 2017-Ohio-9295.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

| STATE OF OHIO | | C.A. No. 16CA011054 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JARELLE N. GUICE | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 12CR085522 |

DECISION AND JOURNAL ENTRY

Dated: December 29, 2017

CALLAHAN, Judge.

{¶1} Defendant-Appellant, Jarelle Guice, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Late one evening, Mr. Guice ignored a police officer's signal to stop his car and led the officer on a brief car chase. At the time, Mr. Guice was the subject of a BOLO ("be on the lookout") because he had threatened his ex-girlfriend several hours earlier. The chase ended when Mr. Guice, having driven to the duplex community where his ex-girlfriend was staying, crashed his car into a neighboring unit. When the officer following him arrived a few seconds later, Mr. Guice fired a gun in the direction of the officer's cruiser, causing the officer to retreat. Mr. Guice then broke into the duplex unit where his ex-girlfriend was staying, held the gun to his head, and threatened suicide.

{¶3} Multiple officers responded to the scene and ultimately cornered Mr. Guice in an outside area. A standoff then ensued and lasted for approximately twenty minutes. During the standoff, Mr. Guice threatened suicide and repeatedly encouraged officers to shoot him. Though officers continuously commanded him to drop his weapon and attempted to calm him, Mr. Guice ignored their attempts at intervention and ultimately stated that "he was going to kill a f***ing cop tonight." Four officers were standing in a group to the north of Mr. Guice, and two of those officers were armed with a shotgun and an assault rifle. Within two minutes of declaring his intention to kill a police officer, Mr. Guice commented on the size of those officers' guns, turned toward their group, and fired his gun in their direction. Multiple officers then returned fire, subdued Mr. Guice, and ended the standoff.

{¶4} A grand jury indicted Mr. Guice on four counts of attempted aggravated murder, five counts of felonious assault, five counts of assault, and one count each of attempted murder, aggravated burglary, having a weapon under disability, receiving stolen property, inducing panic, obstructing official business, and criminal damaging. Nineteen of Mr. Guice's counts contained attendant firearm specifications. Additionally, his felonious assault and assault counts were charged as higher-level felonies due to the presence of an enhancing element (i.e., that the victims were peace officers).

{¶5} A jury trial took place and, at its conclusion, the State dismissed the receiving stolen property count. The jury then deliberated on the remaining counts and specifications and found Mr. Guice guilty. The court merged all of his felonious assault and assault counts into his attempted aggravated murder and attempted murder counts and ultimately sentenced him to a total of 15 years in prison.

{¶6} Mr. Guice now appeals from his convictions and raises six assignments of error for this Court's review. For ease of analysis, this Court consolidates several of his assignments of error.

II.

### ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED BY NOT DISMISSING THE ATTEMPTED AGGRAVATED MURDER AND ATTEMPTED MURDER COUNTS (1-5) PURSUANT TO CRIM. R. 29 BECAUSE THE EVIDENCE WAS INSUFFICIENT AS TO [MR.] GUICE'S INTENT TO KILL.

### ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED BY NOT DISMISSING THE ATTEMPTED AGGRAVATED MURDER COUNTS 1-4 PURSUANT TO CRIM. R. 29 BECAUSE THE EVIDENCE WAS INSUFFICIENT AS TO [MR.] GUICE'S PRIOR CALCULATION AND DESIGN.

### ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED BY NOT DISMISSING THE AGGRAVATED BURGLARY CHARGE PURSUANT TO CRIM. R. 29 BECAUSE THE EVIDENCE WAS INSUFFICIENT AS TO [MR.] GUICE'S INTENT TO COMMIT A CRIME WITHIN THE OCCUPIED STRUCTURE.

{¶7} In the foregoing assignments of error, Mr. Guice argues that the trial court erred by denying his Crim.R. 29 motion because several of his convictions are based on insufficient evidence. This Court disagrees.

{¶8} "'[This Court] review[s] a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence.'" *State v. Bulls*, 9th Dist. Summit No. 27029, 2015-Ohio-276, ¶ 6, quoting *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. Whether the evidence in a case is legally sufficient to sustain a conviction is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶9} A defendant commits aggravated murder if he purposely causes the death of another "with prior calculation and design." R.C. 2903.01(A). "'Prior calculation and design' denotes 'sufficient time and opportunity for the planning of an act of homicide * * *' coupled with circumstances that demonstrate 'a scheme designed to implement the calculated decision to kill * * *.'" *State v. Powell*, 9th Dist. Summit No. 28170, 2017-Ohio-5629, ¶ 9, quoting *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus. "While a few fleeting moments of deliberation or instantaneous deliberations are inadequate to support prior calculation and design, 'a prolonged period of deliberation is [also] unnecessary.'" *State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 80, quoting *Taylor v. Mitchell*, 296 F.Supp.2d 784, 821 (N.D.Ohio 2003). In determining whether an individual acted with prior calculation and design, courts consider the totality of the circumstances. *State v. Guerra*, 9th Dist. Lorain No. 12CA010188, 2013-Ohio-5367, ¶ 6.

{¶10} In the absence of prior calculation and design, purposeful killing constitutes murder. R.C. 2903.02(A). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what [he] intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." Former R.C. 2901.22(A). The attempt statute prohibits any person from

"purposely or knowingly * * * engag[ing] in conduct that, if successful, would constitute or result in [an] offense." R.C. 2923.02(A).

{¶11} The aggravated burglary statute prohibits any person, "by force, stealth, or deception," from

> trespass[ing] in an occupied structure * * * when another person other than an accomplice of the offender is present, *with purpose to commit in the structure * * * any criminal offense*, if * * * [he] has a deadly weapon * * * on or about [his] person or under [his] control.

(Emphasis added.) R.C. 2911.11(A)(2). To satisfy the italicized portion of the statute, the State relied on Mr. Guice's obstructing official business count. A person obstructs official business when he, "without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, [does] any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). Obstructing official business is a fifth-degree felony if, while committing the offense, the offender "creates a risk of physical harm to any person * * *." R.C. 2921.31(B).

{¶12} Officer Wesley Fordyce testified that, on June 2, 2012, he met with Mr. Guice's ex-girlfriend because Mr. Guice had been harassing her. He learned that she and Mr. Guice had recently ended their relationship, but that Mr. Guice was still contacting her, claiming she owed him money. Mr. Guice's ex-girlfriend told Officer Fordyce that Mr. Guice wanted to meet with her and became very upset when she refused. She described how Mr. Guice "began calling her and threatening her and saying he was going to kill her the next time he saw her." Following his conversation with the ex-girlfriend, Officer Fordyce filed a report and advised her to follow up with the prosecutor's office.

{¶13} A.B. was friends with Mr. Guice and his ex-girlfriend and lived in a "four-way duplex" along with her two children. The day after Mr. Guice's ex-girlfriend spoke with Officer Fordyce, she was staying with A.B. A.B. testified that she had invited the ex-girlfriend to stay with her because the ex-girlfriend and Mr. Guice's "on-again-off-again" relationship had yet again ended. A.B. testified that Mr. Guice came to her home that day because he wanted to talk to his ex-girlfriend. Mr. Guice was "pretty mad" at the time and began kicking the door when he was refused entry. Although A.B. attempted to calm Mr. Guice by talking to him through the door, she indicated that he then became even angrier and began making threats. She specified that he threatened to "shoot up [her] house" and "beat[] [his ex-girlfriend's] ass." In response to Mr. Guice's arrival, the ex-girlfriend called the police. A.B. stated that Mr. Guice left before the police arrived.

{¶14} Officer Randall Leiby was dispatched to A.B.'s home at approximately 8:50 p.m. as a result of the ex-girlfriend's call. He spoke with both the ex-girlfriend and A.B., and the ex-girlfriend ultimately signed a complaint against Mr. Guice for a temporary protection order. As a result of the incident, a BOLO was issued for Mr. Guice. Officer Leiby testified that the BOLO included a description of Mr. Guice and of his car.

{¶15} At some point after the police left her home, A.B. heard a loud noise. She looked out her front window to identify the source of the noise and saw that a car had driven through her next door neighbor's front door. She then heard someone knocking on her own front door and realized it was Mr. Guice. A.B. testified that she watched through the window as a police car arrived. Gun shots then rang out, and A.B. saw the police car back away. She testified that, a few seconds later, Mr. Guice broke through her back door patio slider.

{¶16} Directly before Mr. Guice arrived, Officer Adam Ehrke had spotted his car. Officer Ehrke was familiar with the BOLO that had been issued for Mr. Guice, recognized his car from the description contained therein, and attempted to stop it. When he signaled for Mr. Guice to stop, however, Mr. Guice accelerated and tried to elude him. The officer then pursued Mr. Guice and informed dispatch of the situation. There was evidence that the pursuit began a few minutes after 10:30 p.m.

{¶17} Officer Ehrke chased Mr. Guice from a moderate distance and saw him make a left-hand turn into the parking lot that served A.B.'s duplex. He followed, but briefly lost sight of Mr. Guice's car when it turned. As Officer Ehrke pulled into the parking lot and drove towards A.B.'s duplex, he saw that Mr. Guice's car had crashed into one of the neighboring duplex units. He had time to register the fact that the driver's door was hanging open and the car's horn was blaring before he noticed a dark figure standing in a nearby doorway. He then saw a muzzle flash and heard a gunshot before two additional shots were fired. Officer Ehrke testified that he immediately ducked down, put his car into reverse, and radioed that shots had been fired.

{¶18} Officer Ehrke's dashcam recording captured a dark figure firing a gun from a nearby doorway. Though the recording showed that two of the three shots fired struck the pavement in front of Officer Ehrke's cruiser as he backed away, evidence technicians found three points of impact on his cruiser. The first round penetrated the cruiser's lower left bumper. The second round skipped off its left fender and struck the A-frame nearest the windshield on the driver's side. The third round struck the rear passenger's door on the driver's side three inches from the bottom of the cruiser.

{¶19} A.B. testified that, after she saw the police car retreat, Mr. Guice used the butt of a gun to break through her back door patio slider. Once inside, he then put the gun to his head. Because A.B.'s children were home at the time, she quickly ran to them and took them outside. She testified that she then went back inside because Mr. Guice had shut himself in a bedroom with his ex-girlfriend. After A.B. banged on the bedroom door, the ex-girlfriend ran out, and she and A.B. ran outside.

{¶20} Mr. Guice's ex-girlfriend confirmed that, on June 3rd, she signed a complaint for a temporary protection order against Mr. Guice. Not long after, Mr. Guice crashed his car into the unit next door to A.B.'s and broke into her home with a gun. The ex-girlfriend testified that Mr. Guice held the gun to his head and repeatedly threatened to kill himself, so she ran to an upstairs bedroom. Mr. Guice followed her there and paced back and forth with the gun to his head. She then ran from the room and outside to where the police were waiting.

{¶21} Multiple officers responded when Officer Ehrke radioed that Mr. Guice was attempting to flee and that shots had been fired. Officer Ehrke remained on scene after Mr. Guice ran into A.B.'s duplex. He testified that he repositioned his cruiser and was on foot when Mr. Guice exited the back of the duplex. At the time, Mr. Guice was still holding a gun. Though Officer Ehrke repeatedly ordered Mr. Guice to drop his weapon and get on the ground, Mr. Guice began to walk to the south. Officer Ehrke then heard another officer yelling at Mr. Guice from the opposite side of the building. Because several more officers also arrived, Officer Ehrke dropped back and moved to a different location.

{¶22} Officers Craig Payne and Jarrod Nighswander were two of the first officers to respond to Officer Ehrke's radio transmissions. Officer Payne was a canine handler and had his canine with him when he approached the area of A.B.'s apartment on foot. He testified that,

when he first saw Mr. Guice, Mr. Guice was standing outside holding a gun down at his side. Because many people had come outside to see what was happening, Officer Payne began screaming for them to back away while he moved forward. As he confronted Mr. Guice, Mr. Guice placed the gun to his head and began walking backwards, disregarding Officer Payne's commands to stop and drop the gun. Mr. Guice continued to move to the south until he eventually backed himself into an area on the west side of a nearby duplex. Specifically, he backed himself into the corner of a backwards L-shaped area that protruded from the side of the duplex. Meanwhile, Officer Payne positioned himself and his canine to the north, taking cover behind the rear corner of another duplex. Officer Payne testified that he kept his canine with him during his encounter with Mr. Guice because Mr. Guice threatened to shoot the canine if Officer Payne released him.

{¶23} When Officer Nighswander first arrived on scene, he saw Officer Ehrke from behind, pointing his gun at someone and issuing commands. He then stationed himself at the corner of a nearby building and saw Mr. Guice holding a gun to his head. Officer Nighswander testified that Mr. Guice moved the gun several times, placing it at his temple, in his mouth, and under his chin. He stated that he and other officers repeatedly ordered Mr. Guice to drop the gun, but Mr. Guice began walking away from them. Meanwhile, Officer Nighswander screamed for citizens congregating in the area to leave. As he moved forward, Officer Nighswander took cover alongside Officer Payne.

{¶24} Two additional officers ultimately took cover alongside Officers Payne and Nighswander: Officers Randall Leiby and Matthew Bonkoski. Officer Leiby was carrying a twelve gauge shotgun, and Officer Bonkoski was carrying an assault rifle. There was evidence that a standoff with Mr. Guice ensued and lasted for approximately twenty minutes, ending a few

minutes after 11:00 p.m. During the standoff, Mr. Guice threatened to kill himself as officers attempted to calm him. Several officers described him as very agitated, noting that he was continually moving in place and pointing his gun at himself. Eventually, a command was issued that only one officer, Sergeant Albert Rivera, speak directly with Mr. Guice.

{¶25} During the standoff, Sergeant Rivera took cover behind the corner of a duplex to the northwest of Mr. Guice. He testified that he repeatedly asked Mr. Guice to drop his gun, but Mr. Guice would not comply. As the sergeant attempted to bring the situation under control, Mr. Guice made "very hysterical" comments, vacillating between threatening to kill himself and encouraging the officers to shoot him. Sergeant Rivera testified that Mr. Guice became increasingly agitated as the police refused to shoot at him.

{¶26} Near the end of the standoff, Officer Bonkoski heard Mr. Guice say that "he was going to kill a f***ing cop tonight." Likewise, multiple other officers testified that Mr. Guice threatened to kill a police officer. An audio recording of the standoff was captured on Officer Payne's body microphone and, at 10:59 p.m., officers can be heard reacting to Mr. Guice's statement that he was going to kill a police officer. There was testimony that, not long after threatening to kill a police officer, Mr. Guice commented on the size of the guns that Officers Leiby and Bonkoski were carrying. Specifically, Officer Leiby heard Mr. Guice "talking about 'those guys with the big guns over there' and pointing at [him and Officer Bonkoski] in reference to where [they] were at." Additionally, Sergeant Rivera heard Mr. Guice "mention about the guys with the big guns who were north of him * * *." Sergeant Rivera testified that, right after Mr. Guice made that statement, he pointed his gun at that group of officers and shot. At 11:01 p.m., a loud sound resembling a gunshot can be heard on the audio recording from Officer

Payne's body microphone. The sound is followed by a brief pause and then a series of other loud sounds resembling gunshots.

{¶27} Multiple officers testified that Mr. Guice fired his gun before officers returned fire. Officer Leiby stated that, at the end of the standoff, he saw Mr. Guice point his gun in his (Officer Leiby's) direction and heard a loud pop consistent with gunfire coming from Mr. Guice's location. Likewise, Officer Bonkoski testified that Mr. Guice pointed his gun at their group and fired, whereupon Officer Bonkoski was able to see the muzzle flash from Mr. Guice's gun. Lieutenant Leslie Palmer (positioned to the west of Mr. Guice), Officer Fordyce (positioned to the southwest of Mr. Guice), and Officer Payne also testified that they saw a muzzle flash after Mr. Guice pointed his gun at the officers to the north.

{¶28} After the police subdued Mr. Guice, Sergeant Rivera found the gun Mr. Guice had been holding laying "[p]ractically underneath him." There was testimony that the gun was a .40 caliber semi-automatic, was in operable condition, and was capable of holding seven rounds, but was empty upon recovery. Though officers later combed the area where Mr. Guice had been standing, they were unable to recover any casing consistent with having been fired from his gun. Nevertheless, multiple officers testified that they had experienced instances where they knew a gun to have been fired, but were unable to locate the ejected casing. There was also testimony that a number of officers and emergency personnel had walked around the area where Mr. Guice had been standing, such that a casing could have been accidentally kicked aside or carried away in someone's shoe tread.

**Attempted Murder as to Officer Ehrke**

{¶29} Mr. Guice argues that his attempted murder conviction, which relates to Officer Ehrke, is based on insufficient evidence because there was no evidence that he intended to kill

the officer. According to Mr. Guice, the evidence showed that he only shot his gun at the ground in front of Officer Ehrke's cruiser. He argues that there was no evidence he focused his shots directly at the officer or his cruiser; the bullets simply ricocheted once they struck the ground. Because Mr. Guice only fired his gun to scare away Officer Ehrke, he argues, the State failed to set forth sufficient evidence of his intent to kill.

{¶30} "Intent need not be proven by direct testimony." *State v. Elwell*, 9th Dist. Lorain No. 06CA008923, 2007-Ohio-3122, ¶ 26. "[L]ying as it does within the privacy of a person's own thoughts," *State v. Garner*, 74 Ohio St.3d 49, 60 (1995), "'[i]t must be gathered from the surrounding facts and circumstances * * *.'" *State v. Johnson*, 56 Ohio St.2d 35, 38 (1978), quoting *State v. Huffman*, 131 Ohio St. 17 (1936), paragraph four of the syllabus.

> "The specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death." *State v. Walker*, 5th Dist. Stark No. 2005-CA-00286, 2006-Ohio-6240, ¶ 87. Further, "'[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence.'" *Id.* at ¶ 88, quoting *State v. Turner*, 10th Dist. Franklin No. 97APA05-709, 1997 Ohio App. LEXIS 6021, *8-9 (Dec. 30, 1997).

*Elwell* at ¶ 26.

{¶31} Viewing the evidence in a light most favorable to the prosecution, this Court must conclude that the State satisfied its burden of production on the element of intent. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State set forth evidence that, directly after leading Officer Ehrke on a car chase, Mr. Guice quickly exited his car, positioned himself in a nearby doorway, waited for Officer Ehrke to arrive, and then fired his gun three times in the direction of Officer Ehrke's cruiser. Although the cruiser's dashcam recording shows that Mr. Guice's second and third shots initially struck the pavement, it is unclear from the recording where he aimed the first shot. Moreover, there was testimony that the bullets from his gun struck

Officer Ehrke's cruiser in three places: the front bumper, the A-frame, and the rear passenger door on the driver's side. Mr. Guice did not fire his gun into the air or simply threaten Officer Ehrke with it. Instead, he purposely discharged it three times in the direction of the cruiser, knowing that there was an officer behind the wheel. Based on the foregoing facts and circumstances, a rational trier of fact reasonably could have inferred that Mr. Guice purposely attempted to cause Officer Ehrke's death. *See Elwell* at ¶ 26. Accordingly, to the extent his first assignment of error concerns the attempted murder of Officer Ehrke, it is overruled.

**Attempted Aggravated Murder and Attempted Murder as to Officers Payne, Nighswander, Leiby, and Bonkoski**

{¶32} Mr. Guice argues that his attempted aggravated murder convictions, which relate to Officers Payne, Nighswander, Leiby, and Bonkoski, are based on insufficient evidence because the State failed to prove prior calculation and design. He further argues that those convictions, as well as his convictions for the attempted murder of those four officers, are based on insufficient evidence because there was no evidence that he intended to kill them. According to Mr. Guice, there was no forensic evidence definitively establishing that he ever fired his gun during the standoff. Further, even assuming he did, he argues that there was no evidence he aimed at the four officers. As to prior calculation and design, Mr. Guice avers that his actions were "not the result of some well thought out elaborate plan, but rather an instantaneous irrational decision by a mentally disturbed young man who thought and acted as the situation progressed."

{¶33} Viewing the evidence in a light most favorable to the prosecution, this Court must once again conclude that the State satisfied its burden of production on the element of intent. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. As noted, the intent to kill may be

reasonably inferred from the act of pointing and firing a gun in the direction of another human being. *Elwell*, 2007-Ohio-3122, at ¶ 26. Officers Leiby and Bonkoski, who were standing alongside Officers Payne and Nighswander, specifically testified that Mr. Guice pointed his gun in their direction and fired. Though the police were unable to recover a bullet casing from Mr. Guice's gun, multiple officers confirmed that they heard and/or saw him fire in the direction of Officers Payne, Nighswander, Leiby, and Bonkoski. The audio-recording of the incident also captured the sound of a single gunshot in advance of other gunshots. There was testimony that, shortly before he fired his gun, Mr. Guice specifically said "he was going to kill a f***ing cop tonight." Moreover, there was testimony that he commented on the size of Officer Leiby's and Officer Bonkoski's guns directly before turning in their direction and firing. Based on the foregoing facts and circumstances, a rational trier of fact reasonably could have inferred that Mr. Guice purposely attempted to cause the deaths of Officers Payne, Nighswander, Leiby, and Bonkoski. *See id.* Accordingly, to the extent his first assignment of error concerns those officers, it is overruled.

{¶34} "Regarding prior calculation and design, the Ohio Supreme Court has held that there is no bright-line test * * *." *State v. Thomas*, 9th Dist. Summit No. 27405, 2015-Ohio-2377, ¶ 12, citing *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997). Instead, "courts consider the totality of the circumstances in each case * * *." *Guerra*, 2013-Ohio-5367, at ¶ 6. As noted, "'[p]rior calculation and design' denotes 'sufficient time and opportunity for the planning of an act of homicide * * *' coupled with circumstances that demonstrate 'a scheme designed to implement the calculated decision to kill * * *.'" *Powell*, 2017-Ohio-5629, at ¶ 9, quoting *Cotton*, 56 Ohio St.2d 8 at paragraph three of the syllabus. "While a few fleeting moments of deliberation or instantaneous deliberations are inadequate to support prior calculation and design,

'a prolonged period of deliberation is [also] unnecessary.'" *Hairston*, 2006-Ohio-4925, at ¶ 80, quoting *Taylor*, 296 F.Supp.2d at 821.

> [S]everal factors may guide a prior calculation and design analysis, given that no bright-line test exists. *Hairston* at ¶ 81-82. Those factors include any prior relationship between the accused and the victim, the apparent level of thought the accused put into a choice of murder weapon or location, "whether the killing was drawn out or an instantaneous eruption of events," any expressed desire to kill on the part of the accused, any time the accused might have had to stop and reflect during the incident, the choice of the accused to immediately display a weapon and/or retrieve it at any point once the encounter ensued, any pursuit of the victim in which the accused engaged, and the number of shots fired. *Id.* The factors must then "be weighed in concert with the totality of the circumstances surrounding the murder." *Id.* at ¶ 82.

*State v. McCloud*, 9th Dist. Lorain No. 11CA009966, 2012-Ohio-5220, ¶ 12.

**{¶35}** Viewing the evidence in a light most favorable to the prosecution, this Court must conclude that the State satisfied its burden of production on the element of prior calculation and design. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. By the time the standoff with Mr. Guice ensued, he had already fired his gun multiple times at another officer (Officer Ehrke). There was testimony that he first threatened suicide, but then encouraged officers to shoot him and became increasingly agitated as they chose not to do so. The record reflects that the standoff lasted approximately twenty minutes and, during that time, the officers repeatedly commanded Mr. Guice to drop his weapon, attempted to calm him, and assured him that the situation could be resolved if he complied. Mr. Guice, however, repeatedly chose not to alter his course of conduct. *See State v. Toth*, 52 Ohio St.2d 206, 213 (1977). *See also McCloud* at ¶ 12, quoting *Hairston* at ¶ 81-82. Instead, he stated that "he was going to kill a f***ing cop tonight." *See McCloud* at ¶ 12, quoting *Hairston* at ¶ 81-82. Less than two minutes later, he specifically commented on the size of Officer Leiby's and Officer Bonkoski's guns, turned towards their

group, and fired in their direction. Accordingly, there was evidence that he purposely chose to fire at specific officers, i.e., the ones with the largest weapons.

{¶36} The actions that Mr. Guice took "after making the statement [that "he was going to kill a f***ing cop tonight"] support the jury finding that [he] had, before firing * * *, formed an intent and plan to kill * * *." *Toth* at 213. Even if he was suicidal, the law does not abide a plan to bring about one's own death by purposely attempting to end the life of another. "A review of the totality of the circumstances[] establishes that [Mr. Guice] had sufficient time and reflection and engaged in acts rising to the level of prior calculation and design." *Hairston* at ¶ 89. As such, his convictions for attempted aggravated murder are based on sufficient evidence, and his second assignment of error is overruled.

**Aggravated Burglary**

{¶37} Lastly, Mr. Guice argues that his aggravated burglary conviction is based on insufficient evidence because he did not trespass in A.B.'s duplex for the purpose of committing a criminal offense therein. He argues that he completed the offense of obstructing official business when he shot at Officer Ehrke's cruiser and caused him to retreat. Because he completed the offense before entering A.B.'s apartment, Mr. Guice argues, the State failed to prove one of the elements of his aggravated burglary charge.

{¶38} The aggravated burglary statute, as applicable here, prohibits the act of (1) trespassing, (2) by force, (3) in an occupied structure, (4) while armed, (5) with the purpose to commit in the structure "any criminal offense." R.C. 2911.11(A)(2). It is undisputed that the State chose obstructing official business as the "criminal offense" Mr. Guice intended to commit when he trespassed in A.B.'s home. *See* R.C. 2911.11(A)(2). As such, the State had to prove that he trespassed in her home for the purpose of preventing, obstructing, or delaying a public

official's duty. R.C. 2921.31(A). Because the State charged Mr. Guice with felony obstruction, it also had to prove that his actions "create[d] a risk of physical harm" to one or more persons. R.C. 2921.31(B).

{¶39} Viewing the evidence in a light most favorable to the prosecution, this Court must conclude that the State satisfied its burden of production on the "criminal offense" element of aggravated burglary. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The record reflects that, after he shot at Officer Ehrke, Mr. Guice ran to A.B.'s back door patio slider and forcibly broke through the door with the butt of his gun. Though Officer Ehrke had temporarily retreated, he quickly returned after repositioning his cruiser. Moreover, other officers very quickly arrived on scene. By breaking into A.B.'s home, Mr. Guice temporarily stopped officers from apprehending him and created a possible hostage situation. Even if Mr. Guice also wanted to confront his ex-girlfriend, a rational trier of fact reasonably could have concluded that his primary purpose for breaking into A.B.'s home at that time was to prevent the police from apprehending him in accordance with their lawful duties. *See* R.C. 2921.31(A). As such, this Court must conclude that his aggravated burglary conviction is based on sufficient evidence. Mr. Guice's third assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 6

> THE TRIAL COURT ERRED BY ADOPTING THE JURY'S VERDICTS AS TO THE ATTEMPTED AGGRAVATED MURDER AND ATTEMPTED MURDER COUNTS 1-5, FELONIOUS ASSAULT COUNTS 6-9, AGGRAVATED BURGLARY COUNT 11, AND ASSAULT COUNTS 13-16 BECAUSE THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶40} In his sixth assignment of error, Mr. Guice argues that several of his convictions are against the manifest weight of the evidence. This Court disagrees.

**{¶41}** When a defendant argues that his conviction is against the weight of the evidence, this court must review all of the evidence before the trial court.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**{¶42}** Regarding his convictions for having shot at Officers Payne, Nighswander, Leiby, and Bonkoski, Mr. Guice argues that the jury lost its way in convicting him because there was conflicting testimony as to whether he fired his gun. He notes that several officers admitted they never saw a muzzle flash when he allegedly fired, including Sergeant Rivera, who had a clear line of sight. He further notes that the forensic team was unable to find a casing to match his gun in the area where he was standing. Because the standoff was a stressful event, Mr. Guice argues, officers easily could have misconstrued the events that occurred.

**{¶43}** Having reviewed the record, this Court cannot conclude that Mr. Guice's convictions, as they relate to Officers Payne, Nighswander, Leiby, and Bonkoski, are against the manifest weight of the evidence. Multiple officers testified that Mr. Guice was the first person to fire a gun during the standoff and that he fired it in the direction of those officers. Four different officers, two of whom were standing directly in front of Mr. Guice, testified that they saw a

muzzle flash when Mr. Guice fired his gun. Although Sergeant Rivera did not see a muzzle flash, he stated that he saw Mr. Guice raise his gun in the direction of the four officers before he then "heard a pop." He also testified that the first gunshot he heard came from Mr. Guice when he shot in the direction of the four officers.

{¶44} While the police never recovered a casing to match Mr. Guice's gun in the area where he was standing, the record reflects that he was standing on a flowerbed covered in mulch rather than on a flat surface. There was testimony that uneven or textured surfaces such as grass or mulch make it more difficult to find ejected casings. Additionally, there was testimony that multiple officers and paramedics walked through that area before a search could occur. The jury heard testimony that a casing could have been accidentally kicked away or carried off in someone's shoe tread. More than one officer also related having experienced situations where they knew a gun to have been fired, but failed to successfully retrieve the ejected casing.

{¶45} To the extent the jury heard conflicting evidence, it "was in the best position to evaluate the credibility of the witnesses and it was entitled to believe all, part, or none of the testimony of each witness." *State v. Lane*, 9th Dist. Summit No. 28438, 2017-Ohio-8050, ¶ 11, citing *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. The record reflects that the jury chose to believe the testimony of multiple officers, all of whom testified that Mr. Guice fired his gun at the officers standing to his north. Mr. Guice has not shown that this is the exceptional case where the evidence weighs heavily against his convictions. *Otten*, 33 Ohio App.3d at 340. Accordingly, this Court rejects his argument insofar as it concerns his convictions for having shot at Officers Payne, Nighswander, Leiby, and Bonkoski.

{¶46} Mr. Guice also argues that his attempted murder conviction (as to Officer Ehrke) and his aggravated burglary conviction are against the manifest weight of the evidence. As to

both convictions, he asserts that the State's evidence was "insufficient" for the same reasons he offered in support of his sufficiency argument. Yet, "sufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. This Court will not develop a manifest weight argument on Mr. Guice's behalf. *See, e.g., State v. Vanest*, 9th Dist. Summit No. 28339, 2017-Ohio-5561, ¶ 33-36. Because he has not shown that this is the exceptional case where the trier of fact lost its way in convicting him, this Court rejects his argument. *See Otten* at 340. Mr. Guice's sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 4

> THE TRIAL COURT ERRED BY ALLOWING THE STATE TO INTRODUCE EVIDENCE OF A HOLE IN ANOTHER APARTMENT BUILDING THAT IMPLIED, BUT WAS NEVER PROVEN, TO RESULT FROM A BULLET FROM [MR.] GUICE'S GUN.

**{¶47}** In his fourth assignment of error, Mr. Guice argues that the trial court erred when it admitted testimony about a possible bullet hole that the police discovered in an area behind where Officers Payne, Nighswander, Leiby, and Bonkoski had been standing. Because the record reflects that the court's error, if any, was harmless, this Court rejects his argument.

**{¶48}** The decision to admit or exclude evidence lies in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6. An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶49} Officer Michael Darmstadt testified that, after the standoff ended, he was called to the scene to assist with evidence collection. While doing so, he discovered a hole in the side paneling of a building and noted that the hole appeared to be consistent with a bullet hole. The hole was located in a building to the north of the standoff, behind and to the right of the area where Officers Payne, Nighswander, Leiby, and Bonkoski had been standing. Officer Darmstadt took several pictures of the hole, and those pictures were introduced at trial. Mr. Guice objected to the pictures, and the court later refused to admit them into evidence at the close of the State's case. After hearing all the evidence, the court concluded that the State had failed to present evidence linking the hole to the standoff or establishing that the hole had, in fact, been made by a bullet.

{¶50} Mr. Guice acknowledges that the trial court ultimately excluded the photographs of the alleged bullet hole, but argues that Officer Darmstadt's testimony about the hole prejudiced him. According to Mr. Guice, the testimony created a strong implication that he created the bullet hole by firing his gun in the direction of the four officers. Because the State failed to introduce any forensic evidence establishing that he, in fact, did fire his gun at the officers, Mr. Guice argues that the admission of Officer Darmstadt's testimony affected his substantial rights.

{¶51} Even assuming that the trial court erred by admitting Officer Darmstadt's testimony, this Court cannot conclude that the testimony affected Mr. Guice's substantial rights. *See* Crim.R. 52(A) (errors that do not affect substantial rights "shall be disregarded"). Officer Darmstadt readily admitted on cross-examination that no one examined the hole he found or attempted to retrieve a bullet from it so as to determine whether it was, in fact, a bullet hole. He further admitted that he had no idea how long the hole had been there, that it could have been

there for months, and that he had no information about its angle such that one could make any inferences about the trajectory. As such, any implication raised by his testimony was weak, at best.

{¶52} The jury heard multiple police officers testify that Mr. Guice fired his gun in the direction of Officers Payne, Nighswander, Leiby, and Bonkoski. Moreover, they heard testimony that, by that point in the evening, Mr. Guice had already fired at one officer (Officer Ehrke) and had declared his intention "to kill a f***ing cop tonight." Given the wealth of other evidence the State presented, this Court cannot conclude that the admission of Officer Darmstadt's testimony affected the outcome of the trial; particularly in light of the strong points Mr. Guice's counsel elicited when cross-examining Officer Darmstadt. Consequently, any error the trial court may have committed in admitting that testimony was harmless. *See id.* Mr. Guice's fourth assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 5

THE TRIAL COURT ERRED BY CONVICTING [MR.] GUICE OF THE FELONIOUS ASSAULT COUNTS 6-10 AS FIRST DEGREE FELONIES AND ASSAULT COUNTS 13-17 AS FOURTH DEGREE FELONIES BECAUSE THE JURY VERDICT FORMS DID NOT SPECIFY THAT THE VICTIM WAS A PEACE OFFICER.

{¶53} In his fifth assignment of error, Mr. Guice argues that he is entitled to a reduction in the offense-levels of his convictions for felonious assault and assault because the jury failed to make a finding on the indicted, enhancing element (i.e., that the victims were peace officers). He further argues that his counsel was ineffective for failing to object to the jury verdict forms.

{¶54} As to Mr. Guice's ineffective assistance of counsel argument, this Court notes that his captioned assignment of error strictly alleges error on the part of the trial court. This Court has held that "[a]n appellant's captioned assignment of error 'provides this Court with a roadmap

on appeal and directs this Court's analysis.'" *State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 41, quoting *State v. Marzolf*, 9th Dist. Summit No. 24459, 2009-Ohio-3001, ¶ 16. This Court will not address arguments that fall outside the scope of an appellant's captioned assignment of error. *See Pleban* at ¶ 41. Because Mr. Guice has not separately assigned ineffective assistance of counsel as error, this Court will not address his argument on that point. This Court limits its review to his claim of trial court error.

{¶55} R.C. 2945.75(A)(2) provides that,

[w]hen the presence of one or more additional elements makes an offense one of more serious degree[,] * * * [a] guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

The Supreme Court of Ohio has held that the "clear language" of the statute requires "a verdict form signed by a jury [to] include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense." *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, syllabus.

{¶56} Mr. Guice is correct that the verdict forms for his felonious assault and assault charges do not include either the degrees of his offenses or findings that the victims were peace officers. While these omissions ordinarily would prove fatal, *see id.*, the record reflects that the parties reached a stipulation wherein they agreed that it was unnecessary for the jury to make those findings. When instructing the jury on each charge of felonious assault and assault, the trial court stated: "Peace officers. The parties have agreed that [the officer at issue] is a peace officer. *As such, no additional finding is necessary*." (Emphasis added.). Mr. Guice, therefore, did not simply stipulate that the victims were peace officers such that the jury still would have

had to make findings to that effect. *Compare State v. Gregory*, 3d Dist. Hardin No. 6-12-02, 2013-Ohio-853, ¶ 19-21. Rather, he specifically agreed that the jury did not need to make findings to that effect. By raising a *Pelfrey* challenge on appeal, he now seeks to take advantage of an error for which he is responsible. Yet, a party may not take advantage of an error if he either induced it or "affirmatively consented to a procedure the trial judge proposed." *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000). Because Mr. Guice agreed that the jury be repeatedly and explicitly instructed against making findings on the aggravating element of his offenses, he cannot now complain that the jury failed to make those findings. His fifth assignment of error is overruled.

III.

**{¶57}** Mr. Guice's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

---

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

SCHAFER, P. J.
CONCURS.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶58} I respectfully dissent with regard to the majority's decision to affirm Guice's convictions for attempted aggravated murder and aggravated burglary.

{¶59} "The prosecutor is a servant of the law whose interest in a prosecution is not merely to emerge victorious but to see that justice shall be done." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). When selecting charges to present to the grand jury and to zealously prosecute in keeping with the sound administration of justice, it is incumbent upon the State to pursue only those charges that are reasonably supported by the evidence. The charges the State elects to pursue ought to reflect careful consideration of the evidence and its application to the individual elements of each charge. Justice is not served when the State attempts to pursue charges that are simply not supported by the evidence at hand.

{¶60} The record belies the conclusion that Guice (1) broke into an occupied structure for the purpose of obstructing official business, or (2) fired his gun with prior calculation and design. The evidence was such that he broke into the house in question to confront his ex-

girlfriend, or possibly, to harm her or himself. A careful review of the evidence simply does not support the conclusion that Guice broke into the house to avoid apprehension. Accordingly, by relying on obstruction as the predicate offense for aggravated burglary, the State set aside any reasonable application of the evidence to the elements of that charge.

**{¶61}** Likewise, there was simply no evidence that Guice had more than "a few fleeting moments of deliberation" before he fired his gun in the direction of the four officers. *State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 80. Multiple people testified that he was suicidal, panicked, and unstable, and there was no indication that his actions were the product of calculated decision-making. While the State certainly was warranted in charging him with attempted murder, the evidence does not reasonably support the conclusion that he possessed the requisite intent for the elevated murder charge.

**{¶62}** While I in no way condone Guice's behavior or lack appreciation for the lives he put in danger, I cannot agree that the evidence reasonably supports his convictions for aggravated burglary or attempted aggravated murder. Though he clearly engaged in serious criminal conduct, the conduct in which he actually engaged is distinctly different than the conduct with which he was charged. Accordingly, insofar as the majority has affirmed his convictions for aggravated burglary and attempted aggravated murder, I respectfully dissent. I concur in the remainder of the majority's opinion.

APPEARANCES:

STEPHEN P. HANUDEL, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.