[Cite as *State v. Salazar*, 2019-Ohio-2585.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 17AP-858<br>(C.P.C. No. 17CR-886) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Jesse C. Salazar, | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on June 27, 2019

---

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

**On brief**: *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Jesse C. Salazar, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned a verdict finding appellant guilty of felonious assault, with firearm specification, and the trial court separately found him guilty of having weapons while under disability.

{¶ 2} On February 10, 2017, appellant was indicted on one count of felonious assault, in violation of R.C. 2903.11, and one count of having weapons while under disability, in violation of R.C. 2923.13. Count 1 (felonious assault) also carried a 54-month firearm specification, pursuant to R.C. 2941.145(D), and a repeat violent offender specification pursuant to R.C. 2941.149(A). The indictment arose out of an incident on

August 21, 2016, during which Johnson was struck by gunfire outside a residence on Sullivant Avenue.

{¶ 3} On October 2, 2017, the matter proceeded to a jury trial on the felonious assault count, as well as the two attendant specifications. The first witness for the state was Johnson, the shooting victim. Johnson is the father of D.J., age 15. D.J. is a friend of several other teenagers, T.H., D.H., and D.B. Rebecca Peck, the mother of D.B. and D.H., is involved in a dating relationship with appellant. Johnson and appellant did not get along, and Johnson did not want his son to be at Peck's residence if appellant was present.

{¶ 4} On August 21, 2016, D.J. was spending time with D.H. and D.B. at Peck's residence. D.J. called Johnson and told his father that he needed a ride home. Johnson "first told him to ask his mom and he couldn't get ahold of his mom so I told him I was on my way to pick him up." (Tr. Vol. I at 122.) Johnson drove to Peck's residence, located near the intersection of Sullivant and Hague Avenues.

{¶ 5} Upon arrival, Johnson did not initially see his son, but he did observe appellant and Peck, as well as three other individuals, standing outside the residence. Johnson sat in his truck waiting for his son, while Peck went inside to get D.J. During this time, appellant "was talking trash" to Johnson. Appellant told Johnson "he was going to beat my ass." (Tr. Vol. I at 126.)

{¶ 6} Appellant then "took off his shirt and walked in the street and told me to come on." Johnson "asked him did he really want to do this, was he serious." (Tr. Vol. I at 126.) Appellant responded: "Yeah. He was going to beat my ass." Johnson exited his truck, and asked appellant "one more time was he serious, he really wanted to do it, he said, yeah. He walked up on me and swung, and he got the worst end of it." Appellant "grazed" Johnson "a couple of times," but eventually appellant "is not defending himself anymore, he is trying to get away so I just left him alone." (Tr. Vol. I at 127.)

{¶ 7} Johnson then "started arguing" with his son. (Tr. Vol. I at 128.) Johnson "smacked" his son and told him to get inside the truck. D.J. "does get in the car," and Johnson began "walking back to the car." (Tr. Vol. I at 129.) Johnson testified that "the people who were there in the yard are arguing with me, but I guess they are pretty much warning me to get out of there, I better hurry up and go and I am walking back to the car kind of slow." (Tr. Vol. I at 129-30.)

{¶ 8} Johnson testified that appellant then began shooting at him, striking him in the femur. Johnson related: "I wind up on the ground, then I look up, I catch a bullet in the back of my hand, shrapnel sparked my face, * * * catch a shrapnel in my finger, my index finger. I look up, I see him shooting me. I start rolling backwards because he gets to dumping on me." (Tr. Vol. I at 130.) Johnson stated the shooting stopped when appellant "emptied a clip." (Tr. Vol. I at 132.) Appellant was shooting at him from "[u]p on the porch." (Tr. Vol. I at 136.) Johnson further stated: "The screen was wide open and he was higher up than me so I am looking up, but he was, like, right in the doorway. He was pretty much shooting from the doorway." (Tr. Vol. I at 137.)

{¶ 9} After the shooting ceased, Johnson's son assisted him to the truck. When Johnson got up from the ground, appellant "was still in the door and when I stood up, he was shocked, surprised, I guess, more scared, I guess, that I stood up. And then he kind of took off, and I tried to just make it to my truck because I didn't know if he was going to get another gun or -- but I just got in my truck and drove off." (Tr. Vol. I at 132.) Johnson drove to a nearby gas station, and medics subsequently arrived and transported him to a hospital.

{¶ 10} Police detectives spoke with Johnson at the hospital. Detectives showed him a photo array, and he selected a photograph from the array. At trial, Johnson identified appellant as the individual who shot him.

{¶ 11} On the evening of August 21, 2016, Susan Schultz, who resides on Wiltshire Avenue, was sitting outside in her front yard when she heard some individuals "arguing." The voices were "coming from the house at the end of Wiltshire and Sullivant," located approximately six houses from Schultz's residence. (Tr. Vol. I at 156.)

{¶ 12} At one point the arguing stopped, and Schultz "saw somebody run up the back steps, they pulled open the back door and they ran in the house, and almost instantaneously they came back out the front -- out the back door of the same door, they stood on the stoop and they pointed a hand down in a motion like this (indicating) and fired three to five shots." (Tr. Vol. I at 158.) Schultz described the person firing a weapon from the porch area as a white male who was "bald" or with "very close shaven hair," and "wearing white and black clothing." (Tr. Vol. I at 159.) The man "was pointing the gun down towards the * * * sidewalk area." (Tr. Vol. I at 161.) At the moment of the shooting,

Schultz observed "just the one person" on the porch standing at the door. (Tr. Vol. I at 162.)

{¶ 13} After the shooting stopped, Schultz observed "multiple people dispersed, jumped in cars, took off." She also observed the individual on the porch "just running." (Tr. Vol. I at 162.)

{¶ 14} The next witness, T.H., testified during plaintiff-appellee, State of Ohio's, case-in-chief, but was made a court's witness during his testimony. On August 21, 2016, T.H., a nephew of Peck, was staying at Peck's residence with Peck and her four sons. On that date, T.H. was in his room when someone "came up there and said someone is out there fighting, so I went out there and looked to see." T.H. stated that he had "vision problems." (Tr. Vol. I at 173.)

{¶ 15} T.H. then testified: "I ran down the steps. I was looking for a minute and I seen them fighting and then out of no where, some girl came out of no where and just started shooting. I didn't tell -- the day I didn't tell the detectives because I was scared and I didn't know what was going on." (Tr. Vol. I at 175.)

{¶ 16} T.H. spoke with a detective that evening at 9:47 p.m. He told the detective he went to the door and observed two individuals fighting, and that one of the individuals was not doing well during the fight. At trial, the state played a recording of an interview of T.H. conducted by the detective. T.H. told the detective: "I hear some noises outside and someone came in and said that two dudes out here fighting. I don't care. I can't even go out there. So I look out the door a little bit on the balcony and look out here and I see fighting and I just see one dude, he runs -- he runs somewhere and he come back out shooting, and that is when I ran inside again." (Tr. Vol. I at 180.) When asked by the detective who was fighting, T.H. responded: "Some black dude and he might have been like a Mexican, light skin, just like a little bit shorter than me and fat." (Tr. Vol. I at 181.)

{¶ 17} During direct examination, T.H. acknowledged telling the detective that he saw two individuals fighting that evening, and that one of the individuals ran away and then returned and started shooting. He also acknowledged giving a description of the shooter as a light-skinned Mexican male, approximately 5 foot 8 inches or 5 foot 9 inches tall. T.H., who was incarcerated at the time of trial, further admitted that Peck's son, D.H., had visited him in jail approximately 30 times, and that [T.H.] had "[p]ossibly"

discussed the case with D.H.  (Tr. Vol. I at 185.)  On cross-examination, T.H. testified that a female named "Perez" fired the weapon.  (Tr. Vol. I at 190.)

{¶ 18} On August 21, 2016, Columbus Police Officer Matthew Lausch and his partner were dispatched to 2847 Sullivant Avenue following a report of shots fired.  The officers found five or six .45 caliber shell casings near the southeast side of the residence.  Police officers found no weapons inside the Sullivant Avenue residence.

{¶ 19} On August 21, 2016, Columbus Police Officer Edward Chung was dispatched to Sullivant Avenue.  The officer drove to a gas station near the scene of the shooting, where he "observed the vehicle that was described in the run, and I saw the door was open and there was a man that was bleeding."  (Tr. Vol. II at 271.)  The officer called for medics and secured the scene.

{¶ 20} Following the state's case-in-chief, an attorney appointed by the court to represent a potential witness, Jesusa Rebecca Perez, conducted a voir dire of Perez outside the presence of the jury.  During the voir dire, Perez indicated she had been advised by appointed counsel to invoke her Fifth Amendment privilege and to refuse to answer any questions if called to testify.

{¶ 21} The first witness for the defense was Peck, who resides at 2847 Sullivant Avenue.  Peck and appellant are in a dating relationship, and appellant has resided with Peck at the Sullivant Avenue address for the past two years.  Peck is acquainted with Johnson, and his teenage son D.J. is a friend of her sons.  In August 2016, D.J. was staying at Peck's residence; T.H., was also staying there and he was required to wear an ankle monitor arising out of a juvenile court proceeding.  Perez is appellant's sister.

{¶ 22} On the afternoon of August 21, 2016, Peck was at her home with appellant, her sons, and several other individuals, including D.J. and T.H.  Regarding the events that day, Peck testified that appellant was sitting outside the residence in his truck when "Johnson pulled up on the wrong side of the road and he pulled up real fast and slammed on the brakes."  (Tr. Vol. II at 291.)  Johnson "opened up the door, he didn't get all the way out of the truck, but he put half the body out of the truck, his legs, and he started screaming stuff at [appellant] and I am like, what is up [Johnson], do you want [D.J.]?"  Peck then "ran up the fire escape where all the boys were and I said, [D.J.], you need to come outside, your dad is out here and I think there is about to be a fight."  (Tr. Vol. II at 291.)

{¶ 23} Peck then saw "[appellant] and [Johnson] in the middle of the street and they start fighting. [Johnson] beats up [appellant] pretty bad. And my oldest son, [D.H.], come running out around that same time and he went to break it up." (Tr. Vol. II at 292.) Johnson then began cussing at [D.H.], and Peck "ran out in the middle of the street and I pushed [Johnson]." At that point, appellant "had ran." (Tr. Vol. II at 293.)

{¶ 24} Peck then testified: "I was getting [D.H.] up into the yard and [Johnson] was threatening everybody, I'll do this to everybody, you know, and I heard a couple shots go off. And I looked over by the porch, I'm in the yard, and I see [Perez] with a silver gun shooting like towards the ground." (Tr. Vol. II at 293.) Peck testified that appellant had run inside the house.

{¶ 25} During the state's cross-examination of Peck, the prosecution played a recording of an interview of Peck conducted by a police detective. During the interview, Peck told the detective: "I didn't see anything. I looked out the damn window and the cops were pointing damn guns on the house." (Tr. Vol. II at 306.) She further stated: "I don't know what the hell happened out here." When asked by the detective if she heard a shot, Peck responded: "No, I didn't pay attention. If I did, I didn't pay attention." (Tr. Vol. II at 307.) When asked who her boyfriend was, she told the detective "Jesse," and that his last name was "Perez." (Tr. Vol. II at 310.) When asked if his last name was Salazar, Peck responded: "He got - - his last name has changed." (Tr. Vol. II at 313.) Peck told the detective that her boyfriend "lives on Parsons with his mom but he comes and stays with me too; both." (Tr. Vol. II at 310.) She informed the detective they had been dating "[a] few months." (Tr. Vol. II at 311.) Peck denied she was outside when the shooting began. When asked who was shot, Peck responded: "I don't know." (Tr. Vol. II at 312.)

{¶ 26} On cross-examination, Peck acknowledged lying to the detective about whether appellant lived at her residence. Peck also acknowledged telling the detective that appellant was not at the residence when the incident occurred.

{¶ 27} D.B., the son of Peck, resides at 2847 Sullivant Avenue. On the date of the incident, D.B. was at the residence along with D.H. (his brother), Peck, D.J., T.H., and Perez. D.B. has known appellant three or four years. D.B. described D.J. as his best friend.

{¶ 28} Johnson was at the house that day, and D.B. observed Johnson and appellant "out there fighting." D.B. testified that "[appellant] ran into the house, then I seen -- I heard gunshots and I looked over and I seen [Peck]." (Tr. Vol. II at 325.) D.B. then observed "[Peck] run out and [appellant] was behind her in the alley, like trying to catch up with her." (Tr. Vol. II at 325.) D.B. heard "four or five" shots. (Tr. Vol. II at 325.) Later that evening, D.B. was interviewed by a detective. D.B. told the detective he did not see or hear anything.

{¶ 29} On cross-examination, D.B. acknowledged lying to the detective about whether appellant resided at Peck's house. D.B. also told the detective he did not see appellant at the house that day.

{¶ 30} D.H., age 19, resides at 2847 Sullivant Avenue with his mother, Peck. On the date of the incident, D.H. came outside and observed Johnson fighting with appellant. D.H. testified: "I tried to get in between them and tried to stop and Michael turned around and elbowed me in my face and we started arguing, and then me and him almost got in a fight and my mom broke it up. And that is when [appellant] was running, trying to get back to the house, stumbling around and his face was bleeding." (Tr. Vol. II at 351.) D.H. subsequently heard gunshots, but did not see who was firing the weapon. D.H. testified that appellant "was stumbling back towards the back door and that is when the shots were let off." (Tr. Vol. II at 352.) D.H. stated that Perez was at the residence that day.

{¶ 31} Following deliberations, the jury returned verdicts finding appellant guilty of felonious assault, with the firearm specification, and the trial court separately found appellant guilty of having weapons while under disability. The trial court sentenced appellant by entry filed November 8, 2017, imposing a term of incarceration of 6 years as to Count 1, and 3 years as to Count 2, with the sentences to be served concurrently with each other. The court also imposed a mandatory, consecutive 54-month sentence for the firearm specification.

{¶ 32} On appeal, appellant sets forth the following four assignments of error for this court's review:

> [I.] WHEN A WITNESS REFUSES TO TESTIFY AND INVOKES HER FIFTH AMENDMENT RIGHT AGAINST SELF INCRIMINATION, THE TRIAL COURT ERRED WHEN IT DOES NOT PERMIT DEFENSE COUNSEL TO PROFFER HIS QUESTIONS ON THE RECORD.

[II.] APPELLANT'S CONSTITUTIONAL RIGHTS WERE
VIOLATED WHEN THE JURY DID NOT RENDER A
VERDICT ON THE FIREARM SPECIFICAITON THAT HE
HAD A PRIOR FIREARM CONVICTION TYPE DESCRIBED
IN § 2941.141, 2941.144, 2941.145, 2941.146 OR 2941.1412 OF
THE REVISED CODE.

[III.] THE TRIAL COURT ERRED WHEN IT DENIED
DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION
FOR ACQUITTAL.

[IV.] THE VERDICT OF GUILTY TO FELONIOUS ASSAULT
IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 33} Under the first assignment of error, appellant contends the trial court erred in failing to permit defense counsel to proffer questions on the record with respect to a witness who refused to testify. Specifically, appellant notes that defense counsel sought to call his sister, Perez, as a witness. Appellant further notes the trial court appointed counsel for Perez, and appointed counsel, following a discussion with Perez, advised her to refuse to testify and to invoke her Fifth Amendment rights. When counsel for appellant sought to proffer into the record the questions he would have asked this witness had she been called to testify, the trial court refused to allow the proffer. Appellant challenges the trial court's ruling, asserting the court should have permitted defense counsel to proffer the questions outside the presence of the jury.

{¶ 34} By way of background, the record indicates the state filed a pre-trial motion in limine regarding the fact appellant had filed a supplemental witness list on July 12, 2017, which included his sister, Perez. In its motion, the state represented in part: "It is the State's understanding that the defense wishes to present evidence identifying Jesusa Perez as the shooter instead of [appellant]. Further, it is the State's understanding that [appellant] wishes to call his sister as a witness for the purpose of accusing her of the offense." (Mot. in Limine at 2.)

{¶ 35} The state requested the trial court to determine the admissibility of Perez's testimony outside the presence of the jury. According to the state, although Perez could simply deny the allegations, "it is more likely that she will either confess or invoke her Constitutional Rights." Further, the state argued, "[d]ue to the legal ramifications, Ms. Perez should be advised of her right to counsel before making such a statement." Finally, the state asserted that defense counsel should not be permitted to call Perez "for the

purpose of invoking her Fifth Amendment rights in front of the jury."  (Mot. in Limine at 2.)

{¶ 36} Appellant filed a response to the state's motion in limine, arguing the jury should be permitted to hear from all witnesses.  Appellant agreed that "Perez  should  be advised  of  her  rights under the  Fifth  and  Sixth  Amendments," and that "[i]f she is indigent the Court will be asked to appoint counsel for her prior to her being called as a witness."  (Def.'s Response to Mot. in Limine at 1.)

{¶ 37} On August 16, 2017, appellant filed a motion for appointment of counsel to represent Perez.  In the accompanying memorandum in support, counsel for appellant stated in part: "Counsel has talked to witnesses who have indicated that it was Defendant's sister, Jesusa Rebecca Perez, who shot Michael Johnson.  Those witnesses will testify at trial."  Counsel represented that he would "issue a subpoena to Jesusa Rebecca Perez to appear as a witness at trial."  Further, counsel for appellant observed, "Ms. Perez obviously has rights pursuant to the Fifth Amendment to the United States Constitution," and "[t]here may be questions which she chooses not to answer on the basis that her answers might incriminate her."  (Mot. for Appointment of Counsel at 2.)

{¶ 38} On the first day of trial, outside the presence of the jury, the trial court addressed the motion in limine, stating in part:

> THE COURT:  Before the Court the State has filed a motion in limine. It has been responded to by the Defense and Defendant.  * * * At this time the Court is going to grant the State's motion in limine, and let me explain because * * * this morning in * * * chamber there was conversation with both counsel.  This particular motion is pertaining to a possible witness testimony of a Jesusa Perez. * * * The week before trial and no time before that, had this Court been given any information. The State had no information regarding the potential testimony of Ms. Perez. When the Court had a conversation with Defense counsel, Defense counsel stated that he had no idea what she was going to testify to, and so at this time because she was not brought to this Court's attention, * * * at this time there is no independent corroboration that she was even there.  All the * * * records taken by the police, she was never mentioned. * * * But at this time, the * * * Court is granting the state's motion.

(Tr. Vol. I at 9-10.)

{¶ 39} In response, defense counsel inquired of the court: "Are you not going to allow me to call her at all for any purpose?" The court responded: "Only if there is some purpose that you can show the Court that * * * her testimony is relevant. I will need some relevancy before and will do a short voir dire if she shows up and if she comes before I allow her to take the stand." (Tr. Vol. I at 13.)

{¶ 40} Defense counsel informed the court that "[s]he [Perez] will be here all morning." The trial court then stated: "Here is the thing, Mr. Salazar, on your behalf if you are sitting here telling the Court your sister did it, I don't want you convicted. I don't want you convicted if you didn't do this. But if your sister did it and she is coming in to say that, she needs to tell the cops ahead of time, period, end of story. This is not a dog and pony show." (Tr. Vol. I at 13.)

{¶ 41} Following the presentation of the state's case-in-chief, and outside the presence of the jury, the trial court noted on the record it had appointed counsel for Perez. Specifically, the trial court stated: "There was an issue before the Court regarding the potential testimony of a potential witness. It was brought to the Court's attention that perhaps this witness was going to invoke her Fifth Amendment rights. As such, the Court has appointed [Robert] Krapenc to give legal advice to this witness." (Tr. Vol. II at 279.)

{¶ 42} The trial court then inquired of appointed counsel: "[H]ave you done that?" (Tr. Vol. II at 279.) Appointed counsel responded affirmatively, and further stated as follows:

> MR. KRAPENC: I've had an opportunity to interview this young lady and she has explained to me what she would testify to. Obviously, there is still confidentiality so I will not repeat what she has said. Based on what she has told me, I advised her that representing her - - her best course of action at this time is to assert her rights under the Fifth Amendment and refuse to answer any questions at all. After I've explained to her the pitfalls and the pros and cons of testifying, she indicated to me that she was going to follow my advice and refuse to testify and assert the Fifth Amendment.

(Tr. Vol. II at 279-80.)

{¶ 43} At that time, appointed counsel conducted a voir dire of Perez, which included the following exchange between appointed counsel, Perez, and the trial court:

> [MR. KRAPENC:] Q. Ma'am, for the record, state your full name.

A. Jesusa Rebecca Perez.

Q. Ms. Perez, have you been identified to testify in this case?

A. Yes.

Q. And I just introduced myself to you maybe half an hour ago, perhaps, as your appointed attorney, correct?

A. Yes.

Q. And without divulging in the content of our discussion, did you discuss with me what your testimony would be should you be called to testify?

A. Yes.

Q. And did you and I discuss the implications of that testimony, how it may affect you personally?

A. Yes.

Q. And I have advised you, based on what I have heard, that you should take the Fifth Amendment and refuse to answer any questions so that you do not incriminate yourself; was that my advice to you?

A. Yes.

Q. And you have indicated you wish to do that?

A. Yes.

MR. KRAPENC: Okay. Your Honor, if you have any questions for Ms. Perez?

THE COURT: Ms. Perez, at this time is it your intention to invoke the Fifth Amendment?

* * *

THE WITNESS: Yes.

THE COURT: And not to answer any questions?
THE WITNESS: Yes.

THE COURT: And testify - - give no testimony?

THE WITNESS: Yes.

(Tr. Vol. II at 281-82.)

{¶ 44} Following the voir dire of Perez, counsel for appellant stated to the trial court: "There are a number of questions that I would pose to Ms. Perez that do not incriminate her but are still very relevant to the case." The trial court responded: "At this time the Court has made the ruling. We are done with this witness." Counsel for appellant then inquired: "Your Honor, may I proffer the questions that I would have asked, would have been?" The trial court responded: "No." (Tr. Vol. II at 283.)

{¶ 45} In general, "when a witness asserts a privilege against self-incrimination, a court may not rely upon the witness's claim alone, but has a duty to determine whether the witness's refusal to answer is justified." *State v. Moody,* 10th Dist. No. 02AP-353, 2003-Ohio-950, ¶ 35, citing *State v. Jackson*, 92 Ohio St.3d 436, 447 (2001). A valid assertion of the privilege exists "where a witness has reasonable cause to apprehend a real danger of incrimination." *State v. Landrum,* 53 Ohio St.3d 107, 120 (1990), citing *United States v. Apfelbaum,* 445 U.S. 115, 127 (1980). In such cases, the Sixth Amendment right of an accused to compulsory process to obtain favorable witnesses is "limited by the proposed witness's Fifth Amendment right against self-incrimination." *State v. Hayley,* 8th Dist. No. 74718 (Dec. 2, 1999). Federal courts similarly recognize "[a] defendant's right to force a witness to testify must yield to that witness' assertion of his Fifth Amendment privilege against self incrimination, where it is 'grounded on a reasonable fear of danger of prosecution.' " *United States v. Gaitan-Acevedo,* 148 F.3d 577, 588 (6th Cir.1998), quoting *United States v. Damiano,* 579 F.2d 1001, 1003 (6th Cir.1978).

{¶ 46} On appeal, appellant frames the issue as one of error by the trial court in failing to allow defense counsel to proffer his questions into the record (outside the presence of the jury) after appointed counsel advised Perez to refuse to testify and invoke her Fifth Amendment rights. Although asserting error by the trial court as to that ruling, appellant acknowledges it "appears that the trial court determined the refusal [to testify] was justified." (Appellant's Brief at 9.)

{¶ 47} On review, while we agree with appellant that the trial court should have permitted defense counsel to proffer the questions into the record, we further find any error to be harmless. Under Ohio law, "[t]he purpose of a proffer is to preserve alleged

error in the exclusion of evidence for the purposes of appellate review." *In re Power,* 6th Dist. No. L-90-084 (Jan. 4, 1991). *See also State v. Conkle,* 2d Dist. No. 24161, 2012-Ohio-1772, ¶ 35 ("The purpose of a proffer is to assist the reviewing court in determining whether the trial court's exclusion of evidence affected the defendant's substantial rights."). [1]

{¶ 48} In considering the assigned error, this court has reviewed the trial brief of appellant, filed several weeks before trial, which outlines the information defense counsel indicated the defense sought to obtain from Perez even if she refused to testify based on the privilege against self-incrimination. Appellant's trial brief states in part: "Jesusa Rebecca Perez will be asked a number of questions," and "[t]hese questions will establish that she was present on Sullivant Avenue." (Defendant's Trial Brief at 3.) Among the inquiries related to Perez's purported presence at the scene, defense counsel represented that the witness would be asked "the reason Michael Johnson came to Sullivant Avenue to fight with Jesse Salazar," as well as "where Jesse Salazar was when Michael Johnson was shot." (Defendant's Trial Brief at 3.)[2]

{¶ 49} As noted, appellant does not challenge the trial court's determination that the refusal of Perez to testify was justified, and the facts of this case do not present a situation in which a potential witness may have been "mistaken about the danger of incrimination." *State v. Spangler*, 5th Dist. No. 16-CA-12, 2017-Ohio-268, ¶ 33. At trial, testimony from witnesses presented by the defense not only placed Perez at the scene of the shooting on Sullivant Avenue, but also identified her as the individual who fired the shots at Johnson. Thus, had Perez been called as a witness, any answers to questions placing her at the scene of the shooting would have posed a substantial risk of self-incrimination. Further, the privilege against self-incrimination extends not only to answers "which would in and of themselves support a criminal conviction," but also to "answers which would furnish a link in the chain of evidence needed to prosecute." *Vega v. Tivurcio*, 10th Dist. No. 14AP-327, 2014-Ohio-4588, ¶ 11. *See also Bell v. Woods*,

---

[1] As noted, the trial court did not permit the proffer during trial, and the record does not indicate the parties sought to enter any proffer to the court reporter after trial.

[2] During opening statements, defense counsel reiterated the information sought from this witness (as well as the expected testimony), stating to the jury: "Jesusa Perez will also be called. She will confirm that she was there, that she knows both Michael and [D.J.]. She will confirm that Jesse Salazar was in the house when Michael Johnson was shot. I don't know if she will admit on the stand to being the shooter." (Tr. Vol. I at 108.)

E.D.Mich. No. 2:10-CV-13467 (Apr. 15, 2014) (finding reasonable trial court's grant of blanket claim of privilege where potential witness could "legitimately fear incrimination from answering any questions put to him," including "[e]ven his admission that he was present during the drug sales" which, although "not sufficient in itself to convict him of any crime, would be one link in the chain of evidence establishing his guilt").

{¶ 50} As also outlined above, Perez was advised by appointed counsel to invoke her privilege against self-incrimination and "refuse to answer any questions." (Tr. Vol. II at 279.) Perez subsequently expressed, during voir dire, her intent to invoke her Fifth Amendment privilege, stating she would not answer any questions.

{¶ 51} In the present case, the record adequately reflects the substance of the questions sought to be proffered (as well as the evidence the defense sought to introduce). Further, the trial court was aware that Perez had reasonable cause to fear incrimination as to essentially all questions germane to the events at issue (i.e., that the information sought from the witness would be covered under the scope of the Fifth Amendment). As set forth above, defense counsel made clear the questions to be posed to Perez would establish her presence at the crime scene (as well as her observations of the relevant events). The record also makes clear, in the event Perez had been called to the stand, the witness would have immediately claimed her privilege against self-incrimination and refused to answer any questions. Under the circumstances of this case, any error by the trial court in failing to grant defense counsel's request to proffer into the record questions he intended to ask Perez did not affect the outcome of the trial and, therefore, was harmless beyond a reasonable doubt.[3]

{¶ 52} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 53} Under the second assignment of error, appellant contends the verdict form returned by the jury was insufficient to permit the trial court to impose a 54-month sentence on the firearm specification. Appellant maintains the jury verdict form only permitted the trial court to impose sentence as to a three-year firearm specification.

---

[3] Although appellant does not challenge on appeal the validity of Perez's invocation of her Fifth Amendment privilege, we note that any such challenge would itself be subject to harmless error analysis. *See, e.g., State v. Smith,* 10th Dist. No. 16AP-772, 2017-Ohio-7740, ¶ 30-31 (any error in trial court's decision to not require witness to assert privilege against self-incrimination on a question-by-question basis was harmless beyond a reasonable doubt where witness, guided by attorney, "unequivocally stated" he would answer no further questions and trial court concluded witness had genuine risk to his Fifth Amendment rights).

{¶ 54} The state agrees with appellant's argument and concedes error. While noting that the trial court instructed the jury it would have an additional factual question to determine on the verdict form as to whether appellant had been previously convicted of a firearm specification, the state acknowledges "it apparently went unnoticed that the verdict form did not contain the additional factual question to be resolved by the jury." (Appellee's Brief at 6.) Accordingly, the state "agrees that the maximum amount of time the trial court could have imposed for the firearm specification was three years," and therefore the sentence imposed "should be reversed and this matter remanded for further proceedings." (Appellee's Brief at 6.)

{¶ 55} As noted under the facts, Count 1 of the indictment included a 54-month firearm specification based on the allegation appellant had previously been convicted of a firearm specification.[4] A review of the record indicates the trial court read into the record the jury's verdict as follows:

> THE COURT: We, the jury in this case, find the defendant Jesse C. Salazar guilty of Felonious Assault as he stands charged in Count One of the indictment.
>
> We, the Jury, further find that the Defendant did have a firearm on or about his person or under his control while committing the offense, and did display and/or brandish and/or indicate that he did possess the firearm and/or used the firearm to facilitate the offense.

(Tr. Vol. II at 408.)

{¶ 56} The above verdict was also reflected in the signed jury form. As also noted under the facts, the trial court imposed a 54-month sentence on the firearm specification.

{¶ 57} In light of the above record and the state's concession, we conclude the trial court erred in sentencing appellant to a 54-month sentence on the firearm specification. Accordingly, we sustain appellant's second assignment of error and remand this matter to the trial court for re-sentencing on the firearm specification.

---

[4] R.C. 2941.145(A) provides for imposition of a mandatory three-year sentence on a firearm specification if the indictment charges that the individual committing a felony possesses a firearm and "displayed the firearm, brandished the firearm, indicated that the offender possessed a firearm, or used the firearm to facilitate the offense." R.C. 2941.145(D) provides for imposition of an enhanced mandatory prison term of 54 months if the offender had previously been convicted of or entered a guilty plea to a firearm specification of the type described under R.C. 2941.141, 2941.144, 2941.145, 2941.146 or R.C. 2941.1412.

{¶ 58} Appellant's third and fourth assignments of error are interrelated and will be considered together. Under his third assignment of error, appellant contends the trial court erred in denying his Crim.R. 29 motion for acquittal on his convictions for felonious assault and having weapons while under disability. According to appellant, shifting testimony by witnesses undermined the sufficiency of the evidence supporting his convictions. Under the fourth assignment of error, appellant challenges the manifest weight of the evidence supporting those convictions.

{¶ 59} Under Ohio law, "[a] motion for judgment of acquittal, pursuant to Crim.R. 29, tests the sufficiency of the evidence." *State v. Darrington,* 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15, citing *State v. Knipp,* 4th Dist. No. 06CA641, 2006-Ohio-4704, ¶ 11. Thus, "an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim." *Id.,* citing *State v. Barron,* 5th Dist. No. 05 CA 4, 2005-Ohio-6108, ¶ 38. In considering a sufficiency of the evidence challenge, "the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 60} By contrast, in determining whether a conviction is against the manifest weight of the evidence, an appellate court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 61} R.C. 2903.11(A)(2) defines the offense of felonious assault and states in part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2923.13(A)(2) defines the offense of having a weapon while under disability, and provides in part as follows: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence."

{¶ 62} We initially consider the trial court's denial of the motion for judgment of acquittal. Here, construing the evidence most strongly in favor of the state, as we are required to do in considering a sufficiency challenge, the record indicates the following. On August 21, 2016, Johnson drove to the residence of Peck to pick up his son. Upon arriving, appellant began "talking trash" to him. Appellant took off his shirt and told Johnson to "come on." Johnson exited his truck; he and appellant then began fighting. Appellant "got the worst end of it," and Johnson then "just left him alone."

{¶ 63} As Johnson was walking toward his truck, appellant began shooting at him. A bullet struck Johnson in the femur, as well as the back of his hand, and shrapnel also grazed across his face. Johnson, who identified appellant at trial as the shooter, testified that appellant was firing the weapon at him from the porch. The shooting stopped when appellant emptied the clip. A nearby neighbor, Schultz, testified that she observed a white male, who she described as "bald" or having "very close shaven hair," fire between three and five shots from the porch of the residence. Other testimony at trial indicated appellant matched that general description.

{¶ 64} Here, the state presented evidence that, if believed, identified appellant as the individual who fired multiple shots at Johnson, striking him two or three times. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that appellant knowingly caused or attempted to cause serious physical harm to Johnson by means of a firearm, thereby supporting the elements of felonious assault. The evidence was also sufficient to support appellant's conviction for having a weapon under disability, as the state introduced a certified copy of a judgment entry (state's Exhibit G) indicating appellant had previously been convicted of a disqualifying offense, i.e., felonious assault in 2005.

{¶ 65} Appellant also contends generally that, even if the evidence was sufficient to support the verdicts, this court should nevertheless reverse his convictions as against the manifest weight of the evidence. We have previously noted, in addressing appellant's sufficiency challenge, the testimony of Johnson, who identified appellant as the shooter, and Schultz, who testified that a male, who was either bald or with close shaven hair, fired shots at Johnson from the porch. The jury also had the opportunity to consider the testimony of appellant's witnesses, including Peck and D.B. As noted by the state, the trial testimony of those witnesses differed significantly from statements they gave to

investigating authorities at the time of the incident, and Peck and D.B. both acknowledged lying to detectives during the investigation. To the extent the jury heard "conflicting evidence, it 'was in the best position to evaluate the credibility of the witnesses and it was entitled to believe all, part, or none of the testimony of each witness.' " *State v. Guice*, 9th Dist. No. 16CA011054, 2017-Ohio-9295, ¶ 45, quoting *State v. Lane*, 9th Dist. No. 28438, 2017-Ohio-8050, ¶ 11. On review, we conclude the jury did not lose its way so as to create a manifest miscarriage of justice and, therefore, the convictions are not against the weight of the evidence.

{¶ 66} Having found the convictions supported by sufficient evidence and not against the manifest weight of the evidence, appellant's third and fourth assignments of error are overruled.

{¶ 67} Based on the foregoing, appellant's first, third, and fourth assignments of error are overruled, and the second assignment of error is sustained. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed as to appellant's convictions, but reversed and remanded for resentencing with respect to the firearm specification in accordance with law and consistent with this decision.

*Judgment affirmed in part, reversed in part;*
*and cause remanded.*

LUPER SCHUSTER J., concurs.
BRUNNER, J., dissents.


BRUNNER, J., dissenting.

{¶ 68} I respectfully dissent from the decision of the majority, because I would find the trial court erred when it declined to permit an alternative suspect to testify without first determining if there was a sufficient hazard of self-incrimination to justify the witness' invocation of the Fifth Amendment as to any and all questions. In reaching its decision, the trial court did not conduct nor allow sufficient voir dire of the witness, nor permit the defense to proffer so as to preserve the appellate record for our effective review. Because of the trial court's refusal to develop the record, I cannot see how we can determine if the complete ban on the witness' testimony was an error that affected the result of the trial. For the same reason, I also do not see how we can conclude beyond a

reasonable doubt that the trial court's errors in these respects were harmless beyond a reasonable doubt.  Thus I would find we must reverse and remand for a new trial.

## I.    ADDITIONAL FACTS AND PROCEDURAL HISTORY

{¶ 69} In addition to the facts discussed by the majority, I would emphasize the following background.  On February 10, 2017, a Franklin County Grand Jury indicted Salazar for possession of a weapon while under a disability and felonious assault with a 54-month firearm specification and a repeat violent offender specification.  (Feb. 10, 2017 Indictment.)  Prior to trial on the case, in July 2017, the State filed a motion requesting that the trial court prevent Salazar from calling Jesusa Rebecca Perez as a witness on the grounds that Salazar intended to portray her as the true perpetrator of the crime, that none of the police statements taken from other witnesses corroborated this allegation, and that it was impermissible for the defense to inquire after her guilt and then profit by her invocation of the Fifth Amendment privilege against self-incrimination.  (July 14, 2017 Mot. in Lim. at 2-3.)  Salazar responded that inconsistency between witness testimony and police interview summaries is an issue of evidentiary weight for the jury to determine, not something that affects the admissibility of a witnesses' testimony, and that it would be permissible, depending on the questions put to her and the nature of her answers, for the defense to call Perez notwithstanding the possibility that she might invoke the Fifth Amendment.  (July 17, 2017 Resp. in Opp. at 1-2.)

{¶ 70} On the first day of trial, October 2, 2017, the trial court granted the State's motion.  (Tr. at 9-13,[5] filed Jan. 12, 2018.)  It explained that there was no corroboration of Perez' testimony and that the police records did not indicate that she was at the scene.  (Tr. at 10.)  It also indicated that it would need to see some showing that her testimony would be relevant to reconsider its ruling.  (Tr. at 10-13.)  To reiterate what appears in the majority decision, the trial court summed up by addressing the defendant:

---

[5] The trial transcript, including jury selection and sentencing was filed in two consecutively paginated volumes.

> Here is the thing, Mr. Salazar, on your behalf if you are sitting here telling the Court your sister did it, I don't want you convicted. I don't want you convicted if you didn't do this. But if your sister did it and she is coming in to say that, she needs to tell the cops ahead of time, period, end of story. This is not a dog and pony show.

(Tr. at 13.) Later, defense counsel asked the trial court if it could proffer the questions he would have asked of Perez and the trial court responded, "No." (Tr. Vol. II at 283.) The majority notes in footnote 1 that "the record does not indicate the parties sought to enter any proffer to the court reporter after trial." Nothing in the Rules of Criminal Procedure or Evidence or statute or case law requires counsel to make repeated attempts to achieve a different interlocutory ruling on evidence once the trial court has ruled, even on denying proffer for appellate review.

## II.  ASSIGNMENTS OF ERROR

{¶ 71} Among Salazar's four assignments of error, I would sustain the first assignment of error, overrule the third assignment of error, and find moot the second and fourth assignments of error. To reiterate, the assignments of error for discussion in this dissent are:

> 1. WHEN A WITNESS REFUSES TO TESTIFY AND INVOKES HER FIFTH AMENDMENT RIGHT AGAINST SELF INCRIMINATION, THE TRIAL COURT ERRED WHEN IT DOES NOT PERMIT DEFENSE COUNSEL TO PROFFER HIS QUESTIONS ON THE RECORD.
>
> 2. APPELLANT'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE JURY DID NOT RENDER A VERDICT ON THE FIREARM SPECIFICATION THAT HE HAD A PRIOR FIREARM CONVICTION TYPE DESCRIBED IN §2941.141, 2941.144, 2941.145, 2941.146 OR 2941.1412 OF THE REVISED CODE.
>
> 3. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL.
>
> 4. THE VERDICT OF GUILTY TO FELONIOUS ASSAULT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  DISCUSSION

### A.  First Assignment of Error – Whether the Trial Court Erred by Refusing to Permit Counsel to Proffer Questions he Would have Asked a Witness whom the Trial Court had Determined to Exclude

{¶ 72} The Sixth Amendment to the U.S. Constitution and Section 10, Article I of the Ohio Constitution provide an accused with a right of compulsory process to obtain a witness' appearance.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987); *Columbus v. Cooper*, 49 Ohio St.3d 42, 44 (1990).  However, the Supreme Court of Ohio has held "[a] trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination."  *State v. Kirk*, 72 Ohio St.3d 564, 569 (1995), paragraph one of the syllabus (also remarking that a defendant does not "have a right to place [a witness] on the stand for the *sole* purpose of having him assert his Fifth Amendment privilege in front of the jury").[6]  (Emphasis added.)   Yet, a witness may not invoke the Fifth Amendment privilege against self-incrimination by simply asserting that the information sought may, in a general sense, be incriminating.  *Cincinnati v. Bawtenheimer*, 63 Ohio St.3d 260, 266 (1992).  Rather, the judge, not the witness, must determine whether there is a "sufficient hazard of incrimination."  *Id.*; *State v. Landrum*, 53 Ohio St.3d 107, 120 (1990) ("The trial judge must determine if a proposed witness's testimony would be self-incriminating. The witness's claim alone is not adequate."); *see also Hoffman v. United States*, 341 U.S. 479, 486 (1951) ("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified.").

{¶ 73} In order to review such questions effectively on appeal, a record must be preserved.  That is, Evid.R. 103(A)(2) requires an offer of proof in order to preserve any error in excluding evidence, unless the substance of the excluded evidence is apparent from the record.  *See State v. Brooks*, 44 Ohio St.3d 185, 195 (1989); *State v. Grubb*, 28

---

[6] It should be noted that some commentators have questioned the wisdom of this view altogether. Tague, *The Fifth Amendment:  If an Aid to the Guilty Defendant, an Impediment to the Innocent One*, 78 Geo. L.J. 1-70 (1989).  After all, a guilty witness' assertion of privilege is indubitably relevant (and, in some cases, vital) to an innocent defendant seeking to assert that the crime was actually committed by that witness.  *See, e.g., Bowles v. United States*, 439 F.2d 536, 541-42 (D.C. Cir.1970) (defendant accused of murder not permitted to call a witness who had admitted to several other persons that he was the true killer because the witness intended to take the Fifth Amendment when asked if he was the true killer).

Ohio St.3d 199 (1986), paragraph two of the syllabus. An offer of proof generally requires that the party proffer to the court the substance of the desired testimony and how it would have been relevant and material to the defense. *Brooks* at 195. An offer of proof is necessary to preserve procedural errors in the invocation of a witness' Fifth Amendment privilege. *State v. Wilson*, 3d Dist. No. 14-06-19, 2006-Ohio-6930, ¶ 34; *State v. Hayley*, 8th Dist. No. 74718, 1999 WL 1084274, 1999 Ohio App. LEXIS 5679, *28-30 (Dec. 2, 1999).

{¶ 74} In this case, the trial court did not perform the necessary analysis of whether there existed a sufficient hazard of incrimination before permitting Perez to invoke the Fifth Amendment generally. The trial court excluded her testimony entirely and denied the defense the opportunity to make an effective record of the impact of such failure by making a proffer of evidence. The trial judge initially excluded Perez' testimony because it was not corroborated by police records. (Tr. at 9-13.) Then, when it became apparent that other witnesses were going to name Perez as the perpetrator, the judge altered course, appointing an attorney for Perez who broadly advised Perez to "assert her rights under the Fifth Amendment and refuse to answer *any questions at all*." (Emphasis added.) (Tr. at 279.) The trial judge and Perez' appointed attorney questioned Perez only on the limited topic of whether it was her "intention today here in court to invoke [he]r Fifth Amendment Right" without exploring why she needed to do so or why she felt it necessary to invoke the Fifth Amendment as to any and all questions. (Tr. at 281-82.) The trial court rebuffed attempts by the defense to request permission to voir dire the witness outside the presence of the jury as to the basis of her rights assertion. (Tr. at 282-83.) The trial court also declined to permit the defense to question the witness on topics which the defense asserted would not be incriminating. (Tr. at 282-83.) The trial judge also refused the defense's attempt to proffer, as an appellate record for this Court, the questions it would have asked. (Tr. at 283.) In short, the trial court erred when it did nothing to determine whether there was a "sufficient hazard of incrimination" to justify the assertion of the Fifth Amendment and when it thereafter refused to allow the creation of a record that would have permitted the appellate court to review that question.

{¶ 75} The majority has found the substance of the excluded evidence to be apparent from the record, including the "questions sought to be proffered" (as well as the evidence the defense sought to introduce). S*ee* Majority Decision at ¶ 49-51. However, in

the course of this appeal, we took the unusual step of asking counsel for the defense to supply us with a copy of the questions he had wanted to ask Perez—material not in the record from the trial court. *See* Dec. 14, 2018 Notice of Filing of Supp. Record. Even this was not, in my view, sufficient to cure the harm to the defendant and to the process to be able to find that the trial court's error in refusing the proffer was harmless beyond a reasonable doubt. The citation in the majority decision to *State v. Smith,* 10th Dist. No. 16AP-772, 2017-Ohio-7740, ¶ 30-31, does not squarely address this denial by the trial court; the decision's focus is on exclusion of the witness without proof of self-incrimination on a question-by-question basis. *See* Majority Decision at ¶ 48, fn. 2.

{¶ 76} Crim.R. 52(A) requires that appellate courts disregard harmless errors that did not "affect substantial rights" before the trial courts of this state. But to hold an error harmless in a criminal case, the error must have been harmless beyond a reasonable doubt. *See State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987); *State v. Rahman*, 23 Ohio St.3d 146, 150 (1986). Here, because no substantial voir dire of Perez occurred and because the defense was not even permitted to proffer the material it wished to question her about, despite the effort made by the majority to find it from the substance of the testimony at trial or even from supplemental material or its substantive dearth, there is reasonable doubt about the case's outcome. I would find that Salazar's substantial rights to a fair trial have been affected by an error that was more than harmless.

{¶ 77} Salazar's first assignment of error should be sustained.

**B. Second Assignment of Error – Whether the Trial Court Erred in Sentencing Salazar to 54 Months in Prison for the Firearm Specification**

{¶ 78} Salazar was indicted for a 54-month firearm specification pursuant to R.C. 2941.145(D). (Feb. 10, 2017 Indictment.) R.C. 2941.145(A) provides for a mandatory prison term of 3 years if the offender "had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(D) and 2929.14(B)(1)(v) provide for a mandatory prison term of 54 months if, in addition to the conduct contemplated in R.C. 2941.145(A), it is proved that the defendant "previously has been convicted of or pleaded guilty to a firearm specification of the type described in section 2941.141, 2941.144, 2941.145, 2941.146, or 2941.1412 of the Revised Code." R.C. 2941.145(D); *see also* R.C.

2929.14(B)(1)(v). Salazar argues (and the State has conceded) that because the verdict form did not contain a finding that Salazar was previously convicted of another firearm specification or otherwise indicate that the jury intended to convict Salazar of specification set forth in R.C. 2941.145(D), he could only be convicted of the 3-year specification. (Salazar's Brief at 10-11; State's Brief at 5-6.) S*ee also* R.C. 2945.75(A)(2); *State v. McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, ¶ 13-25; *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, ¶ 14. Although the error is conceded, because resolution of the first assignment of error should require reversal and remand for a new trial, I would find this issue to be moot.

## C. Third and Fourth Assignments of Error – Whether the Trial Court Erred in Failing to Grant Salazar's Motion for Acquittal and Whether the Conviction was Against the Manifest Weight of the Evidence

{¶ 79} I would consider Salazar's third and fourth assignments of error together. Salazar argues in his third assignment of error that the trial court should have granted his motion for acquittal and in his fourth assignment of error that the jury's verdict was against the manifest weight of the evidence. Since I would sustain Salazar's first assignment of error, I would find his fourth assignment error moot. Thus I would focus on Salazar's third assignment of error.

{¶ 80} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-

Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 81} Although I would sustain Salazar's first assignment of error requiring remand for a new trial, I would nonetheless address the third assignment of error challenging the sufficiency of the evidence because if it were to be sustained, Salazar could not be retried. That is, "the Double Jeopardy Clause does not preclude retrial of a defendant if the reversal was grounded upon a finding that the conviction was against the weight of the evidence. However, retrial is barred if the reversal was based upon a finding that the evidence was legally insufficient to support the conviction." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 47 (1982). Thus I would consider the third assignment of error from the perspective of jeopardy.

{¶ 82} The Ohio Revised Code defines the offense of felonious assault in relevant part as follows:

> (A)  No person shall knowingly do * * * the following:
>
> * * *
>
> (2) Cause or attempt to cause physical harm to another * * *
> by means of a deadly weapon * * *.

R.C. 2903.11(A)(2). Physical harm to another "means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A deadly weapon is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

{¶ 83} If Salazar shot Johnson, as the jury found, he committed felonious assault. A gun is a deadly weapon and intentionally shooting someone with one is an attempt to cause physical harm. Rather than contest these points, Salazar instead argues that the shifting testimony of the several witnesses at trial is, as a matter of law, insufficient to find that he was actually the one who shot Johnson. (Salazar's Brief at 13.)

{¶ 84} Based on Salazar's identity argument there is also only a narrow dispute as to the weapon under disability offense and firearm specification. *See* R.C. 2923.13; R.C. 2941.145. That is, Salazar stipulated to a disqualifying prior conviction at trial. (State's Ex. F.) And on appeal he does not dispute that. If he shot Johnson, he was properly found

guilty of "hav[ing], carry[ing], or us[ing] any firearm" while under a disability and "ha[ving] a firearm on or about [his] person or under t[his] control while committing the offense and display[ing] the firearm, brandish[ing] the firearm, indicat[ing] that [he] possessed the firearm, or us[ing] it to facilitate the offense."   R.C. 2941.145; R.C. 2923.13(A).

{¶ 85} Johnson positively identified Salazar as the shooter and there is no dispute that Johnson knew and was capable of recognizing Salazar.  (Tr. at 130-32, 141-42, 144-45.)  In addition, the neighbor who witnessed the shooting testified that the shooter was white and bald or with closely cropped hair and other witnesses agreed that Salazar matched that description.  (Tr. at 166-67, 359.)  I would recognize that several witnesses identified Perez and not Salazar, as the shooter.  (Tr. at 189-90, 293, 297, 328-29, 352-53, 358-61.)  I am also cognizant that there was apparently serious enmity between Johnson and Salazar which could have provided a motivation for Johnson to assume and/or testify that Salazar was the one who fired or to falsely implicate him.  (Tr. at 120-21.)  However, in a sufficiency analysis the evidence is viewed in the light most favorable to the State. *Monroe* at ¶ 47.  I therefore would conclude that, based on the evidence the trial court permitted the jury to consider, a "rational trier of fact" could have believed Johnson and the neighbor to the exclusion of the other witnesses and thus "found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 86} Thus, I would overrule Salazar's third assignment of error and consider his fourth assignment to be moot and considered no further.

## IV.  CONCLUSION

{¶ 87} In short, the crux of my dissent is based on my view that the trial court did not adequately question Perez in the instance of her invoking the Fifth Amendment on the record outside of the hearing of the jury.  Compounding this, the trial court subsequently erred again when it did not allow the defense to voir dire Perez, did not permit the defense to question Perez about allegedly non-incriminating topics, and refused to allow the defense to proffer so as to preserve the record for appellate review of whether these errors affected the defendant's right to a fair criminal trial.  Accordingly, I would sustain Perez's first assignment of error and remand his case for a new trial held consistently with law and this decision.  Further, based on the evidence the trial court did permit to be developed and placed before the jury, the evidence against him finding him guilty was not

to my view insufficient to convict, and I would find moot the remaining two assignments of error.

{¶ 88} It may be tempting to try to explain away and minimize the severe procedural deficiencies of Salazar's trial in the face of sufficient evidence to convict him as tried. But, I cannot ignore these deficiencies that could repeat themselves, or worse yet, occur in the future in reliance on our decision today. I cannot find harmless beyond a reasonable doubt the failure of the trial court to allow even a proffer of evidence that never was to be placed before the judgment of the jury but would be preserved for appellate review. Salazar has been denied a fair criminal prosecution without it.

{¶ 89} "The foundation of justice is good faith," said Marcus Tullius Cicero more than 2,000 years ago. Salazar, and the community, have the right to a criminal trial and appellate review conducted fully with the appearance of and in good faith and with a full and fair opportunity to pursue the truth. Accordingly, I respectfully dissent from the decision of the majority.

_____